**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| DAISY RAMSEY )<br><br>        Plaintiff,        )<br><br>v.        )<br><br>C.R. BARD, INC., and BARD        )<br>PERIPHERAL VASCULAR, INC.,        )<br><br>        Defendants.        ) | Civil Action No. 3:25-9575-JFA |

---

### COMPLAINT AND DEMAND FOR JURY TRIAL

---

Plaintiff Daisy Ramsey (hereinafter "Plaintiff"), by and through her attorneys, hereby files this Complaint and Demand for Jury Trial, against Defendants C.R. BARD., INC., and BARD PERIPHERAL VASCULAR, INC., hereinafter collectively referred to as "Bard" and/or "Defendants," and alleges the following:

### <u>INTRODUCTORY ALLEGATIONS</u>

1.      Plaintiff brings this action for personal injuries suffered as a direct and proximate result of being implanted with a defective and unreasonably dangerous Inferior Vena Cava ("IVC") filter medical device manufactured by Bard.

2.      The subject IVC filters are part of Bard's IVC "retrievable" filter product line and include the following devices: Recovery®, G2®, G2X®, (G2 Express®), and Eclipse® (for convenience, unless stated otherwise, these devices will be referred to in this complaint under the generic term "Bard IVC Filters").  The term "Bard IVC Filters" also includes Bard's Recovery® Cone Removal System®.

1

3.     Plaintiff's claims for damages all relate to Bard's design, manufacture, sale, testing, marketing, labeling, advertising, promotion and/or distribution of Bard IVC Filters.

4.     The Bard IVC Filter that is the subject of this action, the Bard Eclipse®, reached Plaintiff and her physicians without substantial change in condition from the time it left Bard's possession.

5.     Plaintiff and her physician used the Bard IVC Filter in the manner, in which it was intended.

6.     Bard is solely responsible for any alleged design, manufacture, or information defects the Bard IVC Filters contain.

7.     Upon information and belief, Bard does not allege that any other person or entity is comparatively at fault for any alleged design, manufacture, or informational defect the Bard IVC Filters contain.

## **PARTIES**

8.     Plaintiff is a citizen and resident of Sumter County, in the state of South Carolina.

9.     Defendant C.R. Bard, Inc. ("C.R. Bard") is a New Jersey corporation with its principal place of business located at 1 Becton Drive in Franklin Lakes, New Jersey.

10.     C.R. Bard is a citizen of New Jersey for diversity-of-citizenship purposes.

11.     C.R. Bard conducts business throughout the United States, including the States of South Carolina.

12.     At all relevant times, C.R. Bard has been engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related

2

entities, its medical devices, including Bard IVC Filters, to be implanted in patients throughout the United States, including and Plaintiff's respective states of residence, implant, and/or injury.

13.    Defendant Bard Peripheral Vascular, Inc. ("BPV") is an Arizona corporation with its principal place of business located at 1625 West 3rd Street in Tempe, Arizona.

14.    BPV is a citizen of Arizona for diversity-of-citizenship purposes.

15.    BPV is a wholly-owned subsidiary of C.R. Bard, Inc.

16.    BPV operates under the business trade name C.R. Bard, Inc.

17.    As a direct and proximate result of having a Bard IVC Filter implanted in him, Plaintiff has suffered permanent and continues injuries and damages.  The injuries and damages sought by Plaintiff may include, without limitation: pain and suffering, bodily injury (including, without limitation, perforation of organs and venous structures, thromboembolic events, and cardiovascular injuries); disability; impairment; scarring; disfigurement; dismemberment; physical, emotional and psychological trauma; anxiety; diminished capacity; past medical expenses; future medical expenses; lost wages; loss of earning capacity; and any other form of damage permissible under applicable law.

18.    There exists, and at all relevant times existed, a unity of interest in ownership between certain defendants and other defendants such that any individuality and separateness between the certain defendants has ceased and those defendants are the alter ego of the other certain defendants, and exerted control over those defendants.

19.    Adherence to the fiction of separate existence of these certain defendants as any entity distinct from other certain defendants would permit an abuse of the corporate privilege, sanction fraud, and promote injustice.

20.     Upon information and belief, at all times herein mentioned each of the Defendants were the agent, servant, employee, and/or joint venturer of the other co-defendants, and at said times each defendant was acting in the full course, scope, and authority of said agency, service, employment, and/or joint venture.

21.     "Bard" or "Defendants" includes any and all parent companies, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind; their predecessors, successors, and assigns; their officers, directors, employees, agents, representatives; and any and all other persons acting on their behalf.

22.     At all times relevant, Bard was engaged in the business of researching, designing, testing, developing, manufacturing, packaging, labeling, marketing, advertising, distributing, promoting, warranting, and selling in interstate commerce Bard IVC Filters, including the Bard IVC Filter at issue in this lawsuit, either directly or indirectly through third parties or related entities.

23.     Bard develops manufactures, sells, and distributes medical devices and surgical products throughout the United States and around the world, including Bard IVC Filters for use in various medical applications, including endovascular surgery.

24.     Upon information and belief, at all relevant times, Defendants expected or should have expected that their acts would have consequences within the United States, including the State of South Carolina, and said Defendants derived and continue to derive substantial revenue therefrom.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states, the amount in controversy exceeds seventy-five

thousand dollars ($75,000) excluding interest and costs, and there is complete diversity of citizenship between Plaintiff and Defendants.

26.     This Court has personal jurisdiction over Defendants because they have sufficient minimum contacts such that asserting jurisdiction over the defendants does not offend traditional notions of fair play and substantial justice. *International Shoe v. Washington*, 326 U.S. 310, 325 (1945). Defendants have conducted and continue to conduct substantial and systematic business activities related to their Bard IVC filters, in this jurisdiction. Such activities include, but are not limited to: (a) sales of IVC filters, including the Bard IVC Filter at issue in this case, in this jurisdiction; (b) hiring, training, and deploying employees, including managers and sales representatives, in this jurisdiction; (c) advertising and marketing of their Bard IVC Filters, including the Bard IVC Filter at issue in this case, in this jurisdiction; (d) maintenance of company files and equipment relating to the Bard IVC Filter in this case, in this jurisdiction; (e) payment of employee salaries in this jurisdiction; and (f) maintenance of a website directed to all states, including South Carolina. Bard directed the sales of this IVC filter and false statements and other tortious acts or omissions, as described throughout this Complaint, toward the State of South Carolina and toward the Plaintiff.

27.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), by virtue of the fact a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District; and Bard IVC Filters are sold and implanted in individuals in the State of South Carolina.

## BACKGROUND

## INFERIOR VENA CAVA FILTERS GENERALLY

28.     IVC Filters were first made commercially available to the medical community in the 1960s.  Over the years, medical device manufacturers have introduced several different designs of IVC filters.

29.     An IVC filter is a device that is designed to filter or "catch" blood clots that travel from the lower portions of the body to the heart and lungs.  IVC filters were originally designed to be permanently implanted in the IVC.

30.     The IVC is a vein that returns blood to the heart from the lower portions of the body.  In certain people, for various reasons, blood clots travel from the vessels in the legs and pelvis, through the vena cava and into the lungs.  Oftentimes, these blood clots develop in the deep leg veins, a condition called "deep vein thrombosis" or "DVT."  Once blood clots reach the lungs, they are considered "pulmonary emboli" or "PE."  Pulmonary emboli present risks to human health.

31.     People at risk for DVT/PE can undergo medical treatment to manage the risk.  For example, a doctor may prescribe anticoagulant therapies such as medications like Heparin, warfarin, or Lovenox to regulate the clotting factor of the blood.  In some people who are at high risk for DVT/PE and who cannot manage their conditions with medications, physicians may recommend surgically implanting an IVC filter to prevent thromboembolic events.

32.     As stated above, IVC filters have been on the market for decades and were permanent implants.  However, use of these filters was limited primarily to patients who were contraindicated for anticoagulation therapy.

33.     In order to increase sales of these devices, Bard sought to expand the market for prophylactic use among non-traditional patient populations that were temporarily at risk of developing blood clots.

34.     Specifically, Bard targeted bariatric, trauma, orthopedic and cancer patient populations.  Expansion to these new patient groups would triple sales and the first manufacturer to market would capture market share.

35.     At the same time, Bard was aware that physicians developed interest in IVC filter devices that could be easily removed after the risk of clotting in these new patient populations subsided.  This too was an opportunity to gain market share in the lucrative IVC filter market.

36.     Other manufacturers also saw this opportunity, triggering a race to market a device that provided physicians with the option to retrieve the filter after the clot risk subsided.

37.     Bard was the first medical device manufacturer to obtain FDA clearance for marketing a "retrievable" IVC filter (the Bard Recovery®) in July 2003.

38.     This "clearance" was obtained despite a lack of adequate testing on the safety and efficacy of the new line of devices.

39.     As shown below, Bard's retrievable IVC filters have been plagued with problems – all created by Bard itself – most notably, the absence of any evidence that the products were effective in preventing pulmonary embolism (the very condition the product was intended to prevent).

40.     Years after the implantation of retrievable filters into the bodies of patients, scientists began to study the effectiveness of the retrievable filters – studies that Bard itself had never done before placing the product on the market.  As recently as October 2015, an expansive article published in the *Annals of Surgery* concerning trauma patients inserted with IVC filters concluded that IVC filters were not effective in preventing pulmonary emboli, andinstead actually caused thrombi to occur.

41.     Comparing the results of over 30,000 trauma patients who had not received IVC filters with those who had received them, the *Annals of Surgery* study published its alarming results:

- Almost twice the percentage of patients with IVC filters in the study died compared to those that had not received them.

- Over five times the relative number of patients with IVC filters developed DVTs.

- Over four times the relative percentage of patients with filters developed thromboemboli.

- Over twice the percentage of patients developed a pulmonary embolus – the very condition Bard told the FDA, physicians, and the public that its IVC filters were designed to prevent.

42.     This *Annals of Surgery* study – and many others referenced by it – now shows without any question that IVC filters are not only utterly ineffective but that they are themselves a health hazard.

## THE RECOVERY® FILTER

**A.     Development and Regulatory Clearance of the Recovery® Filter**

43.     Bard has distributed and marketed the Simon Nitinol Filter ("SNF") device since 1992.  The SNF is a permanent filter with no option to retrieve it after implantation.

44.     The SNF device was initially manufactured by a company known as Nitinol Medical Technologies.  In late 1999, Bard worked with Nitinol on the redesign of the SNF device in order to make it retrievable.  On October 19, 2001, Bard purchased the rights to manufacture,

market, and sell this new, redesigned product in development at the time. This product ultimately became the Recovery® filter.

45.    Bard's purpose for making a retrievable filter was to increase profits by expanding the overall IVC filter market and, in turn, Bard's percentage share of that market.

46.    Bard engaged in an aggressive marketing campaign for the filter, despite negative clinical data.

47.    On November 27, 2002, Bard bypassed the more onerous Food and Drug Administration's ("FDA's") approval process for new devices and obtained "clearance" under Section 510(k) of the Medical Device Amendments to the Food, Drug, and Cosmetic Act to market the Recovery® filter as a *permanent* filter by claiming it was substantially similar in respect to safety, efficacy, design, and materials as the SNF.

48.    Section 510(k) permits the marketing of medical devices if the device is substantially equivalent to other legally marketed predicate devices without formal review for the safety and efficacy of the said device. The FDA explained the difference between the 510(k) process and the more rigorous "premarket approval" ("PMA") process in its amicus brief filed with the Third Circuit in *Horn v. Thoratec Corp.*, which the court quoted from: "[a] manufacturer can obtain an FDA finding of 'substantial equivalence' by submitting a premarket notification to the agency in accordance with section 510(k) of the [Food Drug and Cosmetic Act]. 21 U.S.C. § 360(k) … A device found to be 'substantially equivalent' to a predicate device is said to be 'cleared' by FDA (as opposed to 'approved' by the agency under a PMA … *A pre-market notification submitted under 510(k) is thus entirely different from a PMA which must include data sufficient to*

*demonstrate that the IVC Filters is safe and effective.*" 376 F.3d 163, 167 (3d Cir. 2004) (emphasis in original).

49.    In *Medtronic v. Lohr*, the U.S. Supreme Court similarly described the 510(k) process, observing that "[i]f the FDA concludes on the basis of the [manufacturer's] § 510(k) notification that the device is 'substantially equivalent' to a pre-existing device, it can be marketed without further regulatory analysis … The § 510(k) notification process is by no means comparable to the PMA process; in contrast to the 1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in average of 20 hours … As one commentator noted: '[t]he attraction of substantial equivalence to manufacturers is clear. Section 510(k) notification requires little information, rarely elicits a negative response from the FDA, and gets processed quickly.'" 518 U.S. 470, 478-79 (1996)(quoting Adler, The 1976 Medical Device Amendments: A Step in the Right Direction Needs Another Step in the Right Direction, 43 Food Drug. Cosm. L.J. 511, 516 (1988)).

50.    Pursuant to *Wyeth v. Levine*, 555 U.S. 555 (2009), once a product is cleared "te manufacturer remains under an obligation to investigate and report any adverse events associated with the drug … and must periodically submit any new information that may effect the FDA's previous conclusions about the safety, effectiveness, or labeling …." This obligation extends to post-marketing monitoring of adverse events/complaints.

51.    In July 2003, through this 510(k) process, Bard obtained clearance from the FDA to market the Recovery® filter for optional retrieval.

52.    Although Bard began aggressively marketing the Recovery® filter in 2003, full market release did not occur until January 2004.

53.     Bard was aware that the Recovery® filter was also used extensively off-label, including for purely prophylactic reasons for trauma patients or patients with upcoming surgeries such as bariatric (weight loss) and orthopedic procedures.

54.     The Recovery® filter consists of two (2) levels of six (6) radially distributed NITINOL (a nickel titanium alloy whose full name is Nickel Titanium Naval Ordinance Laboratory) struts that are designed to anchor the filter into the inferior vena cava and to catch any embolizing clots.

55.     This filter has six short struts, which are commonly referred to as the "arms", and six long struts, which are commonly referred to as the "legs."

56.     Each strut is held together by a single connection to a cap located at the top of the filter. According to the patent application filed for this device, the short struts are primarily for "centering" or "positioning" within the vena cava, and the long struts with attached hooks are designed primarily to prevent the device from migrating in response to "normal respiratory movement" or "pulmonary embolism."

57.     The alloy NITINOL possesses "shape memory," meaning NITINOL will change shape according to changes in temperature, then retake its prior shape after returning to its initial temperature.

58.     When placed in saline, the Recovery® filter's NITINOL struts become soft and can be straightened to allow delivery through a small-diameter catheter. The NITINOL struts then resume their original shape when warmed to body temperature in the vena cava.

59.     The Recovery® filter is inserted via catheter guided by a physician (normally an interventional radiologist) through a blood vessel into the inferior vena cava. The Recovery® Filter is designed to be retrieved in a similar fashion.

60.     According to the Instructions for Use ("IFU") of this medical device, on the Recovery® Cone System could be used to retrieve the Recovery® filter (as well as subsequent generations of Bard's IVC Filters).

61.     The Recovery® Cone System is an independent medical device requiring approval by the FDA under the pre-market approval process or, if a substantially equivalent medical device was already on the market, clearance by the FDA pursuant to the 510(k) application process.

62.     Although Bard marketed and sold the Recovery® Cone System separately, at all times relevant, it never sought or obtained approval or clearance from FDA for this device.

63.     Bard's sale of the Recovery® Cone System was therefore, at all times relevant, illegal.

64.     Bard illegally sold the Recovery® Cone System in order to promote the Recovery® filter as having a retrieval option.

**B.     Post-Market Performance Revealed The IVC Filters Failed to Perform as Expected**

65.     Once placed on the market, Bard immediately became aware of numerous confirmed events where its Recovery® filter fractured, migrated, or perforated the vena cava, causing thrombus and clotting, and caused serious injury, including death.

66.     Premarket and post-market clinical trials revealed that the Recovery® filter failed and caused serious risk of harm.  In addition, peer-reviewed literature reflected that such filters actually increased the risk of patients developing thromboembolic events.

67.     Approximately a month after the full-scale launch of the Recovery® filter, on February 9, 2004, Bard received notice of the first death associated with this filter.  The next day,

a MAUDE analysis was performed which revealed that there had been at least two other migration-related adverse events reported to Bard in 2003.

68.     MAUDE is a database maintained by the FDA to house medical device reports submitted by mandatory reporters (such as manufacturers and device user facilities) and voluntary reporters (such as health care providers and patients).

69.     Instead of pulling the Recovery® filter off the market, Bard focused on public relations and protecting its brand and image.  By February 12, 2004, Bard had formed a crisis communication team and drafted at least four communiques to pass onto its sales force containing false information designed to be relayed to concerned doctors.

70.     By April of 2004, at least three (3) deaths had been reported to Bard. Yet again, instead of recalling its deadly device, Bard concealed this information from doctors and patients and hired the public relations firm Hill & Knowlton to address anticipated publicity that could affect stock prices and sales.

71.     Bard made the decision to continue to market and sell the Recovery® filter until its next generation product, the G2® IVC Filter, was cleared by the FDA.

72.     The G2® filter, however, was not cleared for market until August 29, 2005.

73.     Meanwhile, the Recovery® filter death count escalated.

74.     On July 12, 2004, C.R. Bard CEO Timothy Ring received an executive summary reporting that there were at least (12) filter migrations resulting in 4 deaths and at least 17 reports of filter fracture, six of which involved strut embolization to the heart.

75.     This same report advised that fracture rates for the Recovery® filter exceed reported rates of other IVC filters.

76.    These events revealed, or should have revealed, to Bard that the Recovery® filter is prone to unreasonably high risk of failure and patient injury following placement in the human body.

77.    Bard also learned that the Recovery® filter failed to meet migration resistance testing specifications.

78.    In addition, multiple early studies reported that the Recovery® filter has a fracture and migration rate ranging from 21% to 31.7%, rates that are substantially higher compared to other IVC filters.  More recently, fractures were reported to be as high as 40% after five and a half years from the date of implant.

79.    Bard had clear evidence that the Recovery® filter was not substantially equivalent to the predecessor SNF, making the Recovery® filter adulterated and misbranded, requiring its immediate withdrawal from the market.

80.    At least one Bard executive concluded that the Recovery® filter posed an unreasonable risk of harm and required corrective action, including a recall.

81.    Likewise, Bard's was predicted to have fracture rates as high as 37.5% after five years from the date of implant.

82.    Subsequent Bard IVC Filter models, including the electropolished version of the G2® filter known as the Eclipse®, only marginally increased fracture resistance.

83.    When IVC filter fractures occur, shards of the filter or even the entire filter can travel to the heart, where they can cause cardiac tamponade, perforation of the atrial wall, myocardial infarction, and/or death.

84.    Bard IVC filters similarly pose a high risk of tilting and perforating the vena cava walls.  When such tilting occurs, the filters can also perforate the aorta, duodenum, small bowel,

14

spine, or ureter, which may lead to and, upon information and belief, already have lead to retroperitoneal hematomas, small-bowel obstructions, extended periods of severe pain, surgical interventions, and/or death.

85.     The Adverse Event Reports ("AERs") associated with all IVC filters demonstrate that Bard IVC Filters are far mor pone to failure than are other similar IVC filters. A review of the FDA MAUDE database from the years 2004 through 2008 shows that Bard IVC Filters are responsible for the following percentages of all IVC filter AERs:

    a.     50% of all adverse events;

    b.     64% of all occurrences of migration of the IVC Filters;

    c.     69% of all occurrences of vena cava wall perforation;

    d.     70% of all occurrences of filter fracture;

86.     These failures were often associated with severe patient injuries such as:

    a.     Death;

    b.     Hemorrhage;

    c.     Cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart);

    d.     Cardiac arrythmia and other symptoms similar to myocardial infarction;

    e.     Severe and persistent pain; and

    f.     Perforation of tissue, vessels, and organs.

87.     These failures and resulting injuries are attributable, in part, to the fact that the Bard IVC Filter design was unable to withstand the normal anatomical and physiological loading cycles exerted in vivo.

88.     In addition to design defects, Bard IVC Filters suffer from manufacturing defects. These manufacturing defects include, but are not limited to, the existence of "draw markings" and circumferential grinding markings on the exterior of the surface of the filters.

89.     The presence of these draw markings and/or circumferential grinding markings further compromises the structural integrity of the Bard IVC Filters while in the body.  In particular, the Recovery® filter is prone to fail at or near the location of draw markings/circumferential grinding markings on the struts of filters. These exterior manufacturing defects render Bard IVC Filters too weak to withstand normal placement within the human body.

90.     Bard was aware that Bard IVC Filters had substantially higher reported failure rates than all other IVC filters for fracture, perforation, migration, and death.  For example:

   a.     On April 23, 2004, Bard Corporate VP of Quality Assurance sent an email noting that the Recovery® filter's reported failure rates "did not look good compared to permanent filters" and promised to remove the filter from the market if its reported death rate became "significantly greater than the rest of the pack."

   b.     On July 9, 2004, a BPV safety analysis of reported failure rates determined that the Recovery® filter had a reported failure rate that was 28% higher than all other IVC filters.

   c.     On December 17, 2004, analysis determined that the "[r]eports of death, filter migration (movement), IVC perforation, and filter fracture associated with the Recovery® filter were seen in the MAUDE database at reporting rates that were 4.6, 4.4., 4.1, and 5.3 times higher, respectively, than reporting rates for all other filters….These deficiencies were all statistically

significant . . . [and were] significantly higher than those for other retrievable filters.

d.    By December 2004, according to BPV's own findings pursuant to its safety procedure, the Recovery® filter had so many reported failures that it was deemed not reasonably safe for human use and required "correction."

e.    A BPV safety analysis from June 28, 2011, revealed that the Recovery® filter had a reported fracture rate 55 times higher than the SNF.

f.    Whereas the Recovery® filter was reported to have caused over a dozen deaths by early 2005, the SNF had never been reported as associated with a patient death.

**C.    Defendants Knew Why the Recovery® Filter Was Failing and Were Aware of Available Design Changes that Could Substantially Reduce Failures**

91.    Bard knew why the design changes made to the Recovery® filter were causing failures.

92.    Bard was aware that the diameter of the leg hooks was a substantial factor in a filter's ability to resist migration and fatigue.

93.    By reducing the diameter of the hooks on the Recovery® filter, Bard had reduced the device's ability to remain stable and not fracture.

94.    Bard also reduced the leg span on the Recovery® filter from that of the SNF filter by 25%.  As a result, Bard knew its retrievable IVC filters lacked sufficient margin of safety to accommodate expansion of the vena cava (distension) after placement.

95.    Bard was also aware that its failure to electropolish the wire material prior to distribution meant that Bard IVC Filters had surface damage that reduced their fatigue resistance.

96.    Bard was also aware that the Recovery® filter had a high propensity to tilt and perforate the vena cava, which substantially increased the risk of fracture.

97.    Bard was also aware that fatigue resistance could be increased by decreasing the sharpness of the angle of the wire struts where they exited the cap at the top of the IVC filters, and by chamfering (rounding or reducing the sharpness) of the cap edge against which the struts rubbed.

98.    A few examples of Bard's awareness of the unreasonably dangerous problems with Bard IVC Filters include:

a.    On June 18, 2003, BPV engineer Robert Carr sent an email noting that chamfering the edge of the cap would reduce the likelihood of fracture.

b.    On March 16, 2004, a BPV engineer sent an email admitting that the surface damage seen on the Recovery® filter from the manufacturing process decreases fatigue resistance and that electropolishing increases fatigue resistance.

c.    In an April 2004 meeting BPV was warned by its physician consultants, Drs. Venbrux and Kaufman, that the migration resistance of the Recovery® filter needed to be raised from 50 mmHg to 140 mmHg.  They further warned BPV that Bard's Recovery® filter was a "wimpy" filter and its radial force was inadequate to assure stability.

d.    On May 5, 2004, a BPV engineer sent an email stating that adding a "chamfer" to the filter would "address the arm fracture issue."

e.    On May 26, 2004, a BPV engineer sent an email stating that a proposed modified Recovery® filter design with a large chamfer lasted 50 bending

cycles before breaking, whereas another proposed modified Recovery®
filter with a small chamfer broke after ten bending cycles.

99.     Prior to Plaintiff being implanted with a Bard IVC Filter, Bard was aware of other
design changes that could make the Recovery® filter substantially safer.  In a report dated February
16, 2005, BPV describes the design changes to the Recovery® filter, which became known as the
G2® filter.  The report states that the Recovery® filter has been modified to "to increase migration
and fracture resistance, and to minimize the likelihood of leg twisting, appendage snagging, filter
tilting, and caval perforation."  The document goes on to describe the design modifications, which
include:

a.     Increased ground wire diameter of the hook from .0085" to .0105" in order
to improve the fracture resistance of the hook and to improve the migration
resistance of the filter.

b.     The leg span has been increased from 32mm to 40mm in order to improve
the ability of the filter to expand with a distending vena cava reducing risk
of migration.

c.     The total filter arm length has increased from 20mm to 25mm, enlarging the
arm span from 30mm to 33mm to aid in filter centering.

d.     An additional inward bend has been applied to the end of the filter arm in
order to improve arm interaction with the vessel wall and to address caval
perforations and appendage snagging.

e.     The arc of the filter arm, as it attaches to the sleeve, has been modified to
have a smooth radial transition instead of a sharp angle.  This change made

19

in order to reduce the stress concentration generated by the sharp angle and thus improve fracture resistance in the area of the filter.

    f.    The report concludes that the design modifications have substantially reduced the risk of fracture.

100.    Subsequent design changes only marginally improved product safety but did not fully or adequately address the Bard IVC Filters' deadly defects.

101.    Electropolishing was added to the Bard IVC Filters in 2010 to reduce the risk of fracture. Electropolishing implanted Nitinol IVC filters was the industry standard, and increased fatigue resistance by at least 25%, according to Bard's internal testing.

102.    Additional anchors were added to the anchoring system on the filter in 2011, in what became known as the Meridian® Vena Cava Filter. The purpose of this modification was to decrease the risk of tilting, which increases the risk of fracture and perforation, and reduce caudal migration.

103.    Bard added penetration limiters with the introduction of the Denali® Vena Cava Filter in May 2013.

104.    Penetration limiters are designed to reduce perforation and penetration of the vena cava.

**D.    Bard Misrepresented and Concealed the IVC Filters' Risks and Benefits**

105.    Despite knowing that the Recovery® filter was substantially more likely to fracture migrate, tilt, and cause death than any other filter, Bard marketed its IVC filters as being safer and more effective than all other filters through the lifecycle of the product.

106.    Bard further provided mandatory scripts to its Bard IVC filter sales force, which required the sales force to falsely tell physicians that the Recovery® filter was safe because it had the same reported failure rates as all other filters.

107.    Even Bard's updated labeling in December 2004 downplayed and concealed the Recovery® filter's dangerous effects because it suggested fractures almost always cause no harm and that all filters had the same risk of failure.

108.    Bard's updated labeling also downplayed the risk of harm by stating that serious injuries had only been "reported" when Bard knew such injuries in fact occurred.

**E.    Bard Chose to Keep Selling an Unsafe IVC Filter and Lied to Its Own Sales Force to Ensure Market Share and Stock Prices**

109.    Instead of warning the public or withdrawing the IVC filters from the market to fix the problems with its IVC Filters, Defendants retained a public relations firm, opened a task force to prevent information from getting out to the public, and devised a plan to address the public if it did.

110.    In 2004, Bard created a Crisis Communication Team that included members of Bard's upper-level management, Bard's legal department, and independent consultants.

111.    The Crisis Communication Team created a Crisis Communication Plan, which summarized Bard's motivation for withholding risk information from the public as follows: "[t]he proliferation of unfavorable press in top-tier media outlets can cause an onslaught of negative activity: a company's employee morale may suffer, stock prices may plummet, analysts may downgrade the affected company's rating, reputations may be ruined temporarily or even permanently … Extensive preparation is critical to help prevent the spread of damaging coverage."

112.    In an April 2004 email, BPV consultant Dr. John Lehmann, a member of the Crisis Communication Team, advised Bard to conceal from the public Bard's information about the

material risk of its IVC filters.  Bard adopted this advice.  His email states, among other things: "[c]omparison with other filters is problematic in many ways and we should avoid/downplay this as much as possible . . . When pressed, we simply paraphrase what was said in the Health Hazard. That 'Estimates based on available data suggest there is no significant difference in the rates of these complications between any of the IVC Filters currently marketed in the U.S., including the Recovery IVC Filters."

113.    In Dr. Lehmann's April 2004 email, he further stated the following: "I wouldn't raise this subject if at possible . . . It would be a most unusual reporter that will get this far.  The testing data I saw in Arizona showed that although RF was certainly within the boundaries of IVC Filters tested, in larger veins it was near the bottom . . .  I would avoid as much as possible getting into this subject, because I'm not sure others would agree with the conclusion that 'Recovery Vena Cava Filter was just as or more resistant to migration than all retrievable and non-retrievable competitors.'"

114.    Bard also made false representations and/or omissions to the BPV sales force to keep them selling the IVC filters.  Bard reassured the sales force that despite the failures with the Recovery® filter, the Bard IVC filters were safe because they had the same failure rates as all other IVC filters.

115.    By December 2004, BPV's own safety procedure deemed the Recovery® filter not reasonably safe for human use.  Yet Bard continued to market and sell the Recovery® filter into September 2005 and continued to allow its defective product to sit on shelves available to be implanted for an unknown period of time after September 2005.

116.    Even after the G2® filter was launched in September 2005, Bard still failed to warn consumers of the increased risk posed by the Recovery® filter.  Instead, Bard again chose to conceal information about the serious risks of substantial harm from the use of its defective product.

### THE G2®, RECOVERY® G2, AND G2® EXPRESS FILTERS

117.    On or about March 2, 2005, Bard submitted a Section 510(k) premarket notification of intent to market the G2® filter for the prevention of recurrent pulmonary embolism via placement in the inferior vena cava.  In doing so, Bard cited the Recovery® filter as the substantially equivalent predicate IVC filter, which was an inappropriate and illegal predicate device since it was being marketed while adulterated and misbranded for failing, among other things, to be as safe and effective as its predicate device, the SNF.  Bard stated that the only differences between the Recovery® filter and the G2® filter were primarily dimensional, and no material changes or additional components were added.  It was considered by Bard the next generation of the Recovery® filter.

118.    On March 30, 2005, however, the FDA rejected this application unless Bard and BPV included "black box" warnings that read:

> Warning: The safety and effectiveness of the Recovery® Filter System in morbidly obese patients has not been established.  There have been fatal device-related adverse events reported in this population.

> [and]

> [C]entral venous lines may cause the filters to move or fracture.

119.    On April 19, 2005, prior to formally responding to the FDA's request to add a black box warning, BPV CEO Timothy Ring and C.R. Bard CEO John Weiland received an executive summary reporting that there were at least 34 migrations and 51 fractures associated with Bard IVC Filters.

120.    This same report advised Bard executives that there were then nine deaths, six of which related to morbidly obese patients.  Further, 18 of the 51 fractures resulted in fragments migrating to the heart.

121.    On April 20, 2005, without alerting the FDA to the alarming information Bard executives had the day before, Bard submitted a letter in response to the FDA's request to add this black box warning stating that, "There is currently a statement in the IFU linking all of our complications to death."

122.    On August 29, 2005, the FDA cleared the G2® filter for the same intended uses as the Recovery® filter, except that it was not cleared for retrievable use.[1]  Contrary to the FDA's suggestion, no black box warning was added to warn the bariatric patient population of fatalities associated with the use of its filter.[2]

123.    In September of 2005, Bard quietly and belatedly replaced the Recovery® filter on hospital shelves with the G2® filter.  Bard either told doctors or led them to believe that the G2® filter was a new and imp4roved version of the Recovery® filter with the same option to retrieve the filter after implant.

124.    At the same time Bard was selling the G2® (then a permanent use filter, without any retrievability option), Bard was also selling the SNF, which had the same indication for use with nearly zero adverse events.

125.    Bard marketed the G2® filter as having "enhanced fracture resistance," "improved centering," and "increased migration resistance" without any data to back up these representations.

---

[1] The FDA did not clear the G2® filter to be used as a retrievable filter until January 15, 2008.
[2] A warning was eventually added to the IFU in October 2009.

Even if such data existed, Bard witnesses have testified that Bard would not share any such information with doctors if requested.

126.    Moreover, as with its predecessor Recovery® filter, Bard failed to conduct adequate clinical and bench testing ensure the G2® filter would perform safely and effectively once implanted in the human body.

127.    The G2® filter's design causes it to be of insufficient integrity and strength to withstand normal stresses within the human body so as to resist fracturing, migrating, and/or tilting, and/or perforating the inferior vena cava.

128.    In addition to the same design defects as its predecessor device, the G2® filter suffers from the same manufacturing defects. These manufacturing defects include, but are not limited to, the existence of "draw markings" and circumferential grinding markings on the exterior of the surface of the Bard IVC Filters. The presence of these draw markings and/or circumferential grinding markings further compromises the structural integrity of the G2® filter while *in vivo*.

129.    In particular, the G2® filter is prone to fail at or near the location of draw markings/circumferential grinding markings on the struts of the IVC filters.

130.    Put simply, the G2® filter is not of sufficient strength to withstand normal placement within the human body. The presence of the aforementioned exterior manufacturing defects makes Bard IVC filters mor susceptible to fatigue, failure, and migration.

131.    Similarly, although Bard rounded the chamfer at the edge of the cap of the G2® filter, it continued to fracture at that same location.

132.    Thus, the G2® filter shares similar defects and health risks as the Recovery® filter.

133.    Almost immediately upon the release of the G2® filter, Bard received notice of the same series of adverse events of migration, fracture, tilt, and perforation causing the same type of

25

harm as the Recovery® filter. This time, however, a new and different adverse event emerged: the G2® filter would caudally (moving against blood flow) migrate in the direction toward the groin.

134.    The G2® filter fractures were again associated with reports of severe patient injuries such as:

a.    Death;

b.    Hemorrhage;

c.    Cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart);

d.    Cardiac arrythmia and other symptoms similar to myocardial infarction;

e.    Severe and persistent pain;

f.    Perforation of tissue, vessels, and organs.

135.    Bard represents the fracture rate of the G2® filter to be 1.2%. Based upon a review of the data available in the public domain (including the FDA MAUDE database statistics and the published medical literature), this representation does not accurately reflect the true frequency of fractures for the G2® filter.

136.    As with the Recovery® filter, Bard was aware of clinical data showing that the G2® filter was not the substantial equivalent of its predecessor SNF device, requiring immediate recall of the adulterated and misbranded product.

137.    A review of the MAUDE database from the years 2004 through 2008 demonstrates that the Bard IVC Filters (including the G2® filter) are responsible for the majority of all reported adverse events related to IVC filters.

138.    On December 27, 2005, Bard's Medical Affairs Director sent an email questioning why Bard was even selling the modified version of the Recovery® filter, when Bard's SNF had virtually no complaints associated with it.

139.    This further confirms the misbranded and adulterated nature of the device, requiring corrective action, including recall.

140.    On January 15, 2008, the FDA allowed a retrievable option for the G2® filter, G2 Express® filter.  The G2 Express® filter (also known as "G2 X") is identical in design to the G2® filter except that it has a hook at the top of the filter that allows it to be retrieved by snares, as well as Bard's Recovery® Cone System.

141.    The G2 Express® filter contained no design modifications or improvements to alleviate the instability, structural integrity, and perforation problems that Bard knew to exist with the filter via the 510(k) process.

## THE ECLIPSE® FILTER

142.    In a failed attempt to resolve the complications associated with its previous filters, Bard designed the Eclipse® Vena Cava Filter as the next generation in its retrievable filter family.

143.    The Eclipse® filter was cleared by the FDA on January 14, 2010.  The only design changes from the G2® family of filters to the Eclipse® was that the Eclipse® filter was electropolished.

144.    According to Bard's internal testing, electropolishing supposedly increased fracture resistance by 25%.  However, longitudinal studies published in peer-reviewed medical literature found that among 363 patients implanted with the Recovery® filter and 658 patients implanted with the G2® filter, the devices experienced fracture rates of 40% and 37.5%, respectively, after

five and half years. Thus, approximately 28.125% to 30% of Eclipse® filters would still be projected to fracture within five and half years.

145.    Without meaningful design changes, the Eclipse® filter continued to share several of the same design defects and complications associated with the Recovery® filter and G2® family of filters.

146.    Soon after Bard launched the Eclipse® filter, it began receiving complaints and reports of injuries associated with the Eclipse® filter similar those received with its predecessors.

147.    Bard, however, knew and/or soon learned that the Eclipse® filter was not the substantial equivalent of the SNF, making this device also misbranded and adulterated, and subject to recall.

148.    At all times material hereto from the design phase, testing, and manufacture of the Recovery® Filter through the Eclipse® Filter, Bard lacked a thorough understanding of the dynamics of caval anatomy that impacted testing methods.

149.    At this time, Bard's IVC Filters contain the same or substantially similar defects resulting in the same or substantially similar injury to patients, including Plaintiff.

150.    At this time, Bard's IVC Filters are defective, misbranded, and adulterated by virtue of them failing to be the substantial equivalent of their predecessor devices, all of which were required to be the substantial equivalent of their predecessor devices, all of which were required to be as safe and effective as the original predicate device, the Simon Nitinol Filter ("SNF"), and none were/are, making them subject to corrective action, including recall, in the interest of patient safety. The use of each of these subject devices was inappropriate since each was being marketed while defective, adulterated, and misbranded for failing, among other things, to be as safe and effective as the originating predicate device, the SNF.

151.    At all times relevant, safer and more efficacious designs existed for Bard's IVC Filter products, as well as reasonable treatment alternatives.

**ESTOPPEL FROM PLEADING STATUTES OF LIMITATIONS OR REPOSE**

152.    Plaintiff incorporates by reference all prior allegations.

153.    Plaintiff is within the applicable statute of limitations for her claims because Plaintiff (and her healthcare professionals) did not discover, and could not reasonably discover, the defects and unreasonably dangerous condition of her Bard IVC Filter.

154.    Plaintiff's ignorance of the defective and unreasonably dangerous nature of the Bard IVC Filters, and the causal connection between these defects and Plaintiff's injuries and damages, is due in large part to Bard's acts and omissions in fraudulently concealing information from the public and misrepresenting and/or downplaying the serious threat to public safety its products present.

155.    In addition, Bard is estopped from relying on any statutes of limitations or repose by virtue of its unclean hands, acts of fraudulent concealment, affirmative misrepresentations, and omissions.

156.    Such conduct includes intentional concealment from Plaintiff, Plaintiff's prescribing health care professionals, and the general consuming public of material information that Bard IVC Filters had not been demonstrated to be safe or effective, and carried with them the risks and dangerous defects described above.

157.    Bard had a duty to disclose the fact that Bard IVC Filters are not safer or effective, not as safe as other filters on the market, defective and unreasonably dangerous, and that their implantation and use carried with it the serious risk of developing perforation, migration, tilting, and/or fracture.

## PLAINTIFF'S BARD IVC FILTER AND INJURIES

158.    On or about March 2, 2015, Plaintiff was implanted with a Bard Eclipse® filter at Palmetto Health Tuomey Hospital n/k/a Prisma Heath Toumey Hospital in Sumter, South Carolina.

159.    On or about August 16, 2019, Plaintiff underwent a CT scan of her abdomen without contrast at Prisma Health Tuomey, which revealed that multiple filter struts had perforated through the wall of her inferior vena cava.

160.    Plaintiff has also suffered significant, disfiguring injuries, including significant pain and suffering and mental anguish, restricting her ability to engage in activities of daily living.

161.    Furthermore, upon Plaintiff has incurred medical expenses as a result of the implantation of the Bard Eclipse® filter and, upon information and belief, she will continue to incur additional medical expenses in the future.

## COUNT I: STRICT PRODUCTS LIABILITY – FAILURE TO WARN

162.    Plaintiff incorporates by reference all prior allegations.

163.    At all relevant times, Bard engaged in the business of testing, developing, designing, manufacturing, packaging, labeling, marketing, and/or promoting, selling and/or distributing Bard IVC Filters, including the Bard Eclipse®, and through that conduct has knowingly and intentionally placed Bard IVC Filters into the stream of commerce with full knowledge that they reach consumers, such as Plaintiff.

164.    Bard did in fact test, develop, design, manufacture, package, label, market and/or promote, sell, and/or distribute Bard IVC Filters, including the Bard Eclipse®, to Plaintiff, Plaintiff's prescribing health care professionals, and the consuming public.  Additionally, Bard expected that the Bard IVC Filters they were selling, distributing, supplying, manufacturing, and/or promoting to reach, and did in fact reach, prescribing health care professionals and

consumers, including Plaintiff and her prescribing health care professionals, without any substantial change in the condition of the product from when it was initially distributed by Bard.

165.  The Bard IVC Filters, including the Bard Eclipse® filter implanted in Plaintiff, had potential risks and side effects that were known or knowable to Bard by the use of scientific inquiry and information available before, at, and after the manufacture, distribution, and sale of the Bard IVC Filters.

166.  Bard knew or should have known of the defective condition, characteristics, and risks associated with Bard IVC Filters, including the Bard Eclipse®. These defective conditions included, but were not limited to (1) Bard IVC filters posed a significant and higher risk of failure than other similar IVC filters (fracture, migration, tilting, and perforation of the vena cava wall); (2) Bard IVC Filter failures result in serious injuries and death; and (3) certain conditions or post-implant procedures, such as morbid obesity or open abdominal procedures, could affect the safety and integrity of Bard IVC Filters.

167.  Bard IVC Filters, including the Bard Eclipse®, were in a defective and unsafe condition that was unreasonably and substantially dangerous to any user or consumer implanted with Bard IVC Filters, including Plaintiff, when used in an intended or reasonably foreseeable way.

168.  The warnings and directions Bard provided with Bard IVC Filters, including the Bard Eclipse®, failed to adequately warn of the potential risks and side effects of Bard IVC Filters.

169.  These risks were known or were reasonably scientifically knowable to Bard, but not known or recognizable to ordinary consumers, such as Plaintiff, or to Plaintiff's treating doctors.

170.    Bard's IVC Filters, including the Bard Eclipse®, were expected to and did reach Plaintiff without substantial change in their condition, labeling, or warnings as manufactured, distributed, and sold by Bard.

171.    Additionally, Plaintiff and Plaintiff's physicians used the Bard Eclipse® filter in the manner in which it was intended to be used, making such use reasonably foreseeable to Bard.

172.    Had adequate warnings and instructions been provided, Plaintiff would not have been implanted with the Bard Eclipse® and would not have been at risk of the harmful injuries described herein. Bard failed to provide warnings of such risks and dangers to Plaintiff and her medical providers as described herein. Neither Plaintiff, nor Plaintiff's physicians knew, nor could they have learned through the exercise of reasonable care, the risks of serious injury and/or death associated with and/or caused by Bard's IVC Filters, including the Bard Eclipse®.

173.    Bard knew or had knowledge that the warnings that were given failed to properly warn of the increased risks of serious injury and/or death associated with and/or caused by Bard's IVC Filters, including the Bard Eclipse®.

174.    Plaintiff, individually and through her implanting physician, reasonably relied upon the skill, superior knowledge and judgment of Bard.

175.    Bard was under a continuing duty to warn Plaintiff and her physicians of the dangers associated with the Bard IVC filter implanted in Plaintiff.

176.    Safer alternatives were available that were effective and without risks posed by Bard's IVC Filters, including the Bard Eclipse® filter.

177.    As a direct and proximate result of Bard's information defects, lack of sufficient instructions or warnings prior to, on, and after the date Plaintiff used the Bard Eclipse®, Plaintiff suffered permanent and continuous injuries, pain and suffering, disability and impairment.

Plaintiff has suffered emotional trauma, harm, and injuries that will continue into the future. Furthermore, Plaintiff has medical bills, both past and future, related to the care because of the Bard IVC Filters' defects.

## COUNT II: STRICT LIABILITY – DESIGN DEFECT

178.   Plaintiffs incorporate by reference all prior allegations.

179.   At all relevant times, Bard designed, tested, distributed, manufactured, advertised, sold, marketed and otherwise placed into the stream of commerce Bard IVC Filters, including the Bard Eclipse®, for use by consumers, such as Plaintiff, in the United States.

180.   Bard IVC Filters, including the Bard Eclipse® filter, were expected to, and did, reach Bard's intended consumers, handlers, and persons coming into contact with the product, including Plaintiff, without substantial change in the condition in which they were researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Bard.

181.   At all times relevant, Bard's IVC Filters, including the Bard Eclipse®, were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous condition, which was dangerous for use by the public in general and Plaintiff in particular.

182.   Bard IVC Filters, including the Bard Eclipse®, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Bard were defective in design and formulation and unreasonably dangerous in that when they left the hands of Bard's  manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with the use of Bard IVC Filters, and the devices were more dangerous than the ordinary consumer would expect.

183.     Physicians, including Plaintiff's health care providers, implanted Bard IVC Filters, including the Bard Eclipse®, as instructed via the Instructions for Use and in a foreseeable manner as normally intended, recommended, marketed, and promoted by Bard.

184.     Plaintiff received and utilized Defendants' Eclipse® filter in a foreseeable manner as normally intended, recommended, promoted, and marketed by Bard.

185.     At the time Bard placed its defective and unreasonably dangerous Bard IVC Filters, including the Bard Eclipse®, into the stream of commerce, commercially, technologically, and scientifically feasible alternative designs were attainable and available.

186.     These alternative designs would have prevented the harm resulting in Plaintiff's injuries and damages without substantially impairing the reasonably anticipated or intended function of Bard IVC Filters.

187.     As a direct and proximate result of the defective and unreasonably dangerous condition of Bard IVC Filters, including the Bard Eclipse®, Plaintiff suffered permanent and continuous injuries, pain and suffering, disability and impairment. Plaintiff has suffered emotional trauma, harm, and injuries that will continue into the future. Furthermore, Plaintiff has medical bills, both past and future, related to the care because of the Bard IVC Filters' defects.

## COUNT III: NEGLIGENCE – DESIGN

188.     Plaintiffs incorporate by reference all prior allegations.

189.     At the time of the design, distribution, manufacture, advertising, sale, and marketing of Bard IVC Filters, including the Bard Eclipse®, and the filter's implantation in Plaintiff, Bard was aware that Bard IVC Filters were designed and manufactured in a manner presenting:

     a.     An unreasonable risk of fractur of portions of the filters;

b.    An unreasonable risk of migration of the filters and/or portions of the filters;

c.    An unreasonable risk of filters tilting or perforating the vena cava wall; and

d.    Insufficient strength or structural integrity to withstand placement within the human body.

190.    At the time of the design, distribution, manufacture, advertising, sale, and marketing of the Bard IVC Filters, including the Bard Eclipse®, and the filter's implantation in Plaintiff, Bard also was aware that Bard IVC Filters:

a.    Would be used without inspection for defects;

b.    Would be used by patients with special medical conditions, such as those with Plaintiff;

c.    Had previously caused serious bodily injury to its users with special medical conditions, such as those with Plaintiff.

d.    Had no established efficacy;

e.    Were less efficient than the predicate SNF;

f.    Would be implanted in patients where the risk outweighed any benefit or utility of the filters; and

g.    Contained instructions for use and warnings that were inadequate.

191.    Bard had a duty to exercise due care and avoid unreasonable risk of harm to others in the design of Bard IVC Filters, including the Bard Eclipse®.

192.    Bard breached these duties by, among other things:

a.    Designing and distributing a product line in which it knew or should have known that the likelihood and severity of potential harm from the product exceeded the burden of taking safety measures to reduce or avoid harm;

b.   Designing and distributing a product which it knew or should have known that the likelihood and severity of potential harm from the product exceeded the likelihood of harm from other IVC filters available for the same purpose;

c.   Failing to perform reasonable pre- and post-market testing of Bard IVC Filters to determine whether or not the products were safe for their intended use;

d.   Failing to use reasonable and prudent care in the design, research, manufacture, and development of Bard IVC Filters so as to avoid the risk of serious harm associated with the use of Bard IVC Filters;

e.   Advertising, marketing, promoting, and selling Bard IVC Filters for uses other than as approved and indicated in the products' labels;

f.   Failing to establish an adequate quality assurance program used in the manufacturing of Bard IVC filters; and

g.   Failing to perform adequate evaluation and testing of Bard IVC Filters when such evaluation and testing would have revealed the propensity of Bard IVC Filters to cause injuries similar to those that Plaintiff suffered.

193.   As a direct and proximate result of the above-described negligence in design of Bard IVC Filters, including the Bard Eclipse®, Plaintiff suffered permanent and continuous injuries, pain and suffering, disability and impairment.  Plaintiff has suffered emotional trauma, harm, and injuries that will continue into the future.  Furthermore, Plaintiff has medical bills, both past and future, related to the care because of the Bard IVC Filters' defects.

**COUNT IV: NEGLIGENCE – FAILURE TO WARN**

194.   Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

36

195.     At all relevant times, Bard knew or should have known that Bard IVC Filters, including the Bard Eclipse®, were defective and dangerous or were likely to be dangerous when used in a reasonably foreseeable manner.

196.     Such danger included the propensity of Bard IVC Filters, including the Bard Eclipse®, to cause injuries similar to those suffered by Plaintiff.

197.     At all relevant times, Bard also knew or reasonably should have known that the users of Bard IVC Filters, including Plaintiff, would not realize or discover on their own the dangers presented by Bard IVC Filters.

198.     Reasonable manufacturers and reasonable distributors, under the same or similar circumstances as those of Bard prior to, on, and after the date of Plaintiff's use of the Bard Eclipse® filter at issue, would have warned of the dangers presented by Bard IVC Filters, or instructed on the safe use of Bard IVC Filters.

199.     Prior to, on, and after the date of Plaintiff's use of the Bard Eclipse®, Bard had a duty to adequately warn of the dangers presented by Bard IVC Filters and/or instruct on the safe use of Bard IVC Filters.

200.     Bard breached these duties by failing to provide adequate warnings to Plaintiff communicating the information and dangers described above and/or providing instruction for safe use of Bard IVC Filters, including the Bard Eclipse®.

201.     As a direct and proximate result of Bard's negligent failure to warn, Plaintiff suffered permanent and continuous injuries, pain and suffering, disability and impairment. Plaintiff has suffered emotional trauma, harm, and injuries that will continue into the future. Furthermore, Plaintiff has medical bills, both past and future, related to the care because of the Bard IVC Filters' defects.

## COUNT V: NEGLIGENT MISREPRESENTATION

202.   Plaintiffs incorporate by reference all prior allegations.

203.   Prior to, on, and after the date on which Plaintiff was implanted with the Bard Eclipse® filter, Bard negligently and carelessly represented to Plaintiff, Plaintiff's treating physicians, and the general public that Bard IVC Filters, including the Bard Eclipse®, were safe, fit, and effective for use.

204.   These representations were untrue.

205.   Bard owed a duty in all of its undertakings, including the dissemination of information concerning its IVC filters to exercise reasonable care to ensure that it did not in those undertakings create unreasonable risks of personal injury to others.

206.   Bard disseminated to health care professionals and consumers through published labels, labeling, marketing materials, and otherwise information concerning the properties and effects of Bard IVC Filters, including the Bard Eclipse®, with the intention that health care professionals and consumers would rely upon that information in their decisions concerning whether to prescribe and use Bard IVC Filters.

207.   Bard, as medical device designers, manufacturers, sellers, promoters and/or distributors, knew or should reasonably have known that health care professionals and consumers, in weighing the potential benefits and potential risks of prescribing or using Bard IVC Filters, including the Bard Eclipse®, would rely upon information disseminated and marketed by Bard to them regarding the Bard IVC Filters.

208.   Bard failed to exercise reasonable care to ensure that the information they disseminated to health care professionals and consumers concerning the properties and effects of Bard IVC Filters, including the Bard Eclipse®,  was accurate, complete, and not misleading and,

as a result, disseminated information to heal care professionals and consumers that was negligently and materially inaccurate, misleading, false, and unreasonably dangerous to consumers such as Plaintiff.

209.    Bard, as designers, manufacturers, sellers, promoters, and/or distributors, also knew or reasonably should have known that patients receiving Bard IVC Filters, including the Bard Eclipse®, as recommended by health care professionals in reliance upon information disseminated by Bard as the manufacturer/distributor of Bard IVC Filters would be placed in peril of developing the serious, life-threatening, and life-long injuries including, but not limited to, tilting, migration, perforation, fracture, lack of efficacy, and increased risk of the development of blood clots, if the information disseminated and relied upon was materially inaccurate, misleading, or otherwise false.

210.    Bard had a duty to promptly correct material misstatements it knew others were relying upon in making healthcare decisions.

211.    Bard failed in each of these duties by misrepresenting to Plaintiff and the medical community the safety and efficacy of Bard IVC Filters, including the Bard Eclipse®, and failing to correct known misstatements and misrepresentations.

212.    As a direct and proximate result of Bard's negligent misrepresentation, Plaintiff suffered permanent and continuous injuries, pain and suffering, disability and impairment. Plaintiff has suffered emotional trauma, harm, and injuries that will continue into the future. Furthermore, Plaintiff has medical bills, both past and future, related to the care because of the Bard IVC Filters' defects.

## COUNT VI: BREACH OF EXPRESS WARRANTY

213.    Plaintiffs incorporate by reference all prior allegations.

214.   Plaintiff, through her medical providers, purchased the Bard Eclipse® filter from Bard.

215.   At all relevant times, Bard was a merchant of goods of the kind including medical devices and vena cava filters (i.e., Bard IVC Filters).

216.   At the time and place of sale, distribution, and supply of Bard IVC Filters, including the Bard Eclipse®, to Plaintiff (and to other consumers and the medical community), Bard expressly represented and warranted that Bard IVC Filters were safe; that they were well tolerated, efficacious, fit for their intended purpose, and of marketable quality; that they did not produce any unwarned-of dangerous side effects; and that they were adequately tested.

217.   At the time of Plaintiff's purchase from Defendants, Bard IVC Filters, including the Bard Eclipse®, were not in a merchantable condition, and Bard breached its expressed warranties, in that Bard IVC Filters:

   a.   Were designed in such a manner so as to be prone to an unreasonably high incidence of fracture, perforation of vessels and organs, and/or migration;

   b.   Were designed in such a manner so as to result in a unreasonably high incidence of injury to the vessels and organs of its purchaser;

   c.   Were manufactured in such a manner that the exterior surface of the filter was inadequately, improperly, and inappropriately constituted, causing the device to weaken and fail;

   d.   Were unable to be removed at any time during a person's life;

   e.   Were not efficacious in the prevention of pulmonary emboli;

   f.   Carried a risk of use that outweighed any benefit; and

   g.   Were not self-centering;

218.    As a direct and proximate result of Bard's breach of its express warranty, Plaintiff suffered permanent and continuous injuries, pain and suffering, disability and impairment. Plaintiff has suffered emotional trauma, harm, and injuries that will continue into the future. Furthermore, Plaintiff has medical bills, both past and future, related to the care because of the Bard IVC Filters' defects.

## COUNT VII: BREACH OF IMPLIED WARRANTY

219.    Plaintiff incorporates by reference all prior allegations.

220.    Bard impliedly warranted that Bard IVC Filters, including the Bard Eclipse®, were of merchantable quality and safe and fit for the use for which Bard intended them, and Plaintiff in fact used the Bard Eclipse® filter.

221.    Bard breached its implied warranties by:

    a.    Failing to provide adequate instruction that a manufacturer exercising reasonable care would have provided concerning the likelihood that Bard IVC Filters, including the Bard Eclipse®, would cause harm;

    b.    Manufacturing and/or selling Bard IVC Filters, including the Bard Eclipse®, when those filters did not conform to representations made by Bard when they left Bard's control;

    c.    Manufacturing and/or selling Bard IVC Filters, including the Bard Eclipse®, that were more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner;

    d.    Manufacturing and/or selling Bard IVC Filters, including the Bard Eclipse®, that carried foreseeable risks associated with the Bard IVC Filter design or formulation which exceeded the benefits associated with that design;

e.    Manufacturing and/or selling Bard IVC Filters, including the Bard Eclipse®, when they deviated in a material way from the design specifications, formulas, or performance standards or from otherwise identical units manufactured to the same design specifications, formulas, or performance standards; and

f.    Impliedly representing that its filters would be effective in the prevention of pulmonary emboli.

222.    As a direct and proximate result of Bard's breach of its implied warranty, Plaintiff suffered permanent and continuous injuries, pain and suffering, disability and impairment. Plaintiff has suffered emotional trauma, harm, and injuries that will continue into the future. Furthermore, Plaintiff has medical bills, both past and future, related to the care because of the Bard IVC Filters' defects.

## COUNT VIII: FRAUDULENT MISREPRESENTATION

223.    Plaintiff incorporates by reference all prior allegations.

224.    At all times relevant, and as detailed above, Bard intentionally provided Plaintiff, Plaintiff's physicians, the medical community, and the public at large with false or inaccurate information.  Bard also omitted material information concerning Bard IVC Filters, including the Bard Eclipse®, including, but not limited to, misrepresentations regarding the following topics:

a.    The safety of the Bard IVC Filters;

b.    The efficacy of the Bard IVC Filters;

c.    The rate of failure of the Bard IVC Filters;

d.    The pre-market testing of the Bard IVC Filters;

e.    The approved uses of the Bard IVC Filters; and

       f.      The ability to retrieve the device at any time over a person's life.

225.    The information Bard distributed to the public, the medical community, and Plaintiff was in the form of reports, press releasees, advertising campaigns, labeling materials, print advertisements, commercial media containing material misrepresentations, and instructions for use, as well as through their officers, directors, agents, and representatives.

226.    These materials contained false and misleading material misrepresentations, which included: that Bard IVC Filters, including the Bard Eclipse®, were safe and fit when used for their intended purpose or in a reasonably foreseeable manner; that they did not pose dangerous health risks in excess of those associated with the use of other similar IVC filters; that any and all side effects were accurately reflected in the warnings; and that they were adequately tested to withstand normal placement within the human body.

227.    Bard made the foregoing misrepresentations knowing that they were false or without reasonable basis. These materials include instructions for use and a warning document that was included in the package of Bard IVC Filters, including the Bard Eclipse® implanted in Plaintiff.

228.    Bard's intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff's health care providers; to gain the confidence of the public and the medical community, including Plaintiff's health care providers; to falsely assure the public and the medical community of the quality of Bard IVC Filters, including the Bard Eclipse®, and their fitness for use; and to induce the public and the medical community, including Plaintiff's health care providers to request, recommend, prescribe, implant, purchase, and continue to use Bard IVC Filters, all in reliance on Bard's misrepresentations.

229.    The foregoing representations and omissions by Bard were false.

230.    Bard IVC Filters, including the Bard Eclipse®, are not safe, fit, and effective for human use in their intended and reasonably foreseeable manner.

231.    Further, the use of Bard IVC Filters, including the Bard Eclipse®, is hazardous to the users' health, and Bard IVC Filters have a serious propensity to cause users to suffer serious injuries, including without limitation, the injuries and damages Plaintiff has alleged in this Complaint.

232.    Finally, Bard IVC Filters, including the Bard Eclipse®, have a statistically significant higher rate of failure and injury than do other comparable IVC filters.

233.    In reliance upon the false and negligent misrepresentations and omissions made by Bard, Plaintiff and her health care providers were induced to, and did use the Bard Eclipse® filter, thereby causing Plaintiff to sustain severe and permanent personal injuries.

234.    Bard knew and had reason to know that Plaintiff, Plaintiff's health care providers, and the general medical community did not have the ability to determine the true facts intentionally and/or negligently concealed and misrepresented by Bard, and would not have prescribed and implanted Bard IVC filters, including the Bard Eclipse®, if the true facts regarding Bard IVC Filters had not been concealed and misrepresented by Bard.

235.    Bard had sole access to material facts concerning the defective nature of the products and their propensities to cause serious and dangerous side effects in the form of dangerous injuries and damages to people, like Plaintiff, who were implanted with Bard IVC Filters, including the Bard Eclipse®.

236.    At the time Bard failed to disclose and intentionally misrepresented the foregoing facts, and at the time Plaintiff was implanted with the Bard Eclipse® filter, Plaintiff and her health care providers were unaware of Bard's misrepresentations and omissions.

237.    As a direct and proximate result of Bard's fraudulent misrepresentations, Plaintiff suffered permanent and continuous injuries, pain and suffering, disability and impairment. Plaintiff has suffered emotional trauma, harm, and injuries that will continue into the future. Furthermore, Plaintiff has medical bills, both past and future, related to the care because of the Bard IVC Filters' defects.

### COUNT IX: FRAUDULENT CONCEALMENT

238.    Plaintiff incorporates by reference all prior allegations.

239.    In marketing and selling Bard IVC Filters, including the Bard Eclipse®, Bard concealed material facts from Plaintiff and Plaintiff's health care providers.

240.    These concealed material facts include, but are not limited to:

a.    Bard IVC Filters, including the Bard Eclipse®, were unsafe and not fit when used for their intended purpose or in a reasonably foreseeable manner;

b.    Bard IVC Filters, including the Bard Eclipse®, posed dangerous health risks in excess of those associated with the use of other similar IVC filters;

c.    That there were additional side effects related to implantation and use of Bard IVC Filters, including the Bard Eclipse®, that were not accurately and completely reflected in the warnings associated with Bard IVC Filters; and

d.    That Bard IVC Filters, including the Bard Eclipse®, were not adequately tested to withstand normal placement within the human body.

241.    Plaintiff and Plaintiff's health care providers were not aware of these and other facts concealed by Bard.

242.    In concealing these and other facts, Bard intended to deceive Plaintiff and Plaintiff's health care providers.

243.    Plaintiff and Plaintiff's health care providers were ignorant of and could not reasonably discover the fact Bard fraudulently concealed and reasonably and justifiably relied on Bard' representations concerning the supposed safety and efficacy of Bard IVC Filters, including the Bard Eclipse®.

244.    As a direct and proximate result of Bard's fraudulent concealment of material facts, Plaintiff suffered permanent and continuous injuries, pain and suffering, disability and impairment. Plaintiff has suffered emotional trauma, harm, and injuries that will continue into the future. Furthermore, Plaintiff has medical bills, both past and future, related to the care because of the Bard IVC Filters' defects.

### COUNT X: VIOLATION OF APPLICABLE STATE LAW PROHIBITING CONSUMER FRAUD AND UNFAIR AND DECEPTIVE TRADE PRACTICES

245.    Plaintiff incorporates by reference all prior allegations.

246.    Bard had a statutory duty to refrain from unfair or deceptive acts or practices in the sale and promotion of Bard IVC Filters, including the Bard Eclipse®.

247.    Bard knowingly, deliberately, willfully and/or wantonly engaged in unfair, unconscionable, deceptive, fraudulent, and misleading acts or practices in violation of all states' consumer protection laws identified below.

248.    Through its false, untrue, and misleading promotion of Bard IVC Filters, including the Bard Eclipse®, Bard induced Plaintiff to purchase and/or pay for the purchase of the Bard Eclipse®.

249. Bard misrepresented the alleged benefits and characteristics of Bard IVC Filters, including the Bard Eclipse®; suppressed, omitted, concealed, and failed to disclose material information concerning known adverse effects of Bard IVC Filters, including the Bard Eclipse®; misrepresented the quality and efficacy of Bard IVC Filters, including the Bard Eclipse®, as compared to much lower-cost alternatives; misrepresented and advertised that Bard IVC Filters, including the Bard Eclipse®, were of a particular standard, quality, or grade that they were not; misrepresented Bard IVC Filters, including the Bard Eclipse®, in such a manner that later, on disclosure of the true facts, there was a substantial likelihood that Plaintiff would have opted for an alternative IVC filter or method of preventing pulmonary emboli.

250. Bard's conduct created a likelihood of, and in fact caused, confusion and misunderstanding.

251. Bard's conduct misled, deceived, and damaged Plaintiff, and Bard's fraudulent, misleading, and deceptive conduct was perpetrated with an intent that Plaintiff rely on said conduct by purchasing and/or paying for purchases of Bard IVC Filters, including the Bard Eclipse®.

252. Moreover, Bard knowingly took advantage of Plaintiff, who was unable to protect her own interests due to ignorance of the harmful adverse effects of Bard IVC Filters, including the Bard Eclipse®.

253. Bard's conduct was willful, outrageous, immoral, unethical, oppressive, unscrupulous, unconscionable, and substantially injurious to Plaintiff and offends the public conscience.

254. Plaintiff purchased the Bard Eclipse® filter primarily for personal, family, or household purposes.

255.    As a result of Bard's violative conduct in the State of South Carolina, Plaintiff purchased and/or paid for the purchase of the Bard Eclipse® filter that was not made for resale.

256.    Based on the foregoing, Bard engaged in unfair competition or deceptive trade practices in violation of SC ST § 39-5-10, *et seq.*

257.    As a direct and proximate result of Bard's violation of South Carolina law prohibiting consumer fraud and unfair and deceptive trade practices, Plaintiff suffered permanent and continuous injuries, pain and suffering, disability and impairment.  Plaintiff has suffered emotional trauma, harm, and injuries that will continue into the future.  Furthermore, Plaintiff has medical bills, both past and future, related to the care because of the Bard IVC Filters' defects.

## COUNT XI:   PUNITIVE DAMAGES

258.    Plaintiff incorporates by reference all prior allegations.

259.    At all times material hereto, Bard knew or should have known that Bard IVC Filters, including the Bard Eclipse®, were unreasonably dangerous with respect to the risk of tilt, fracture, migration, and/or perforation.

260.    At all times material hereto, Bard attempted to misrepresent and did knowingly misrepresent facts concerning the safety of Bard IVC Filters, including the Bard Eclipse®.

261.    Bard's misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiff's physicians, concerning the safety of its Bard IVC Filters, including the Bard Eclipse®.

262.    Bard's conduct, as alleged throughout this Complaint, was willful, wanton, and undertaken with a conscious indifference and disregard of the consequences that consumers of their products faced, including Plaintiff.

263.    At all times material hereto, Bard knew and recklessly disregarded the fact that Bard IVC Filters, including the Bard Eclipse®, have an unreasonably high rate of tilt, fracture, migration, and/or perforation.

264.    Notwithstanding the foregoing, Bard continued to market Bard IVC Filters, including the Bard Eclipse®, aggressively to consumers, including Plaintiff and her health care providers, without disclosing the aforesaid risks.

265.    Bard knew of its Bard IVC Filters' lack of warnings regarding the risk of fracture, migration, and/or perforation, but intentionally concealed and/or recklessly failed to disclose that risk and continued to market, distribute, and sell its filters without said warnings so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff, in conscious disregard of the foreseeable harm caused by Bard IVC Filters, including the Bard Eclipse®.

266.    Bard's intentional and/or reckless failure to disclose information deprived Plaintiff's physicians of necessary information to enable them to weigh the true risks of using Bard IVC Filters, including the Bard Eclipse®, against its benefits.

267.    Bard's conduct is reprehensible, evidencing an evil hand guided by an evil mind and was undertaken for pecuniary gain in reckless and conscious disregard for the substantial risk of death and physical injury to consumers, including Plaintiff.

268.    Such conduct justifies an award of punitive or exemplary damages in an amount sufficient to punish Bard's conduct and deter like conduct by Bard and other similarly situated persons and entities in the future.

*     *     *

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff demands judgment against Defendants for:

A.     Compensatory damages, including without limitation past and future medical expenses; past and future pain and suffering; past and future emotional distress; past and future loss of enjoyment of life; past and future lost wages and loss or earning capacity; and other consequential damages as allowed by law.

B.     Punitive damages in an amount sufficient to punish Defendants and deter similar conduct in the future;

C.     Disgorgement of profits;

D.     Restitution;

E.     Statutory damages, where authorized;

F.     Costs and fees of this action, including reasonable attorneys' fees;

G.     Prejudgment interest and all other interest recoverable; and

H.     Such other additional and further relief as Plaintiff may be entitled to in law or equity according to the claims pled herein.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff respectfully requests trial by jury in the above case as to all issues.

Respectfully Submitted,

s/ JAMES L. WARD, JR.
James L. Ward, Jr. (D.S.C. Bar No. 6956)
MCGOWAN, HOOD & FELDER, LLC
321 Wingo Way, Suite 103
Mt. Pleasant, SC  29464
Telephone: (843) 388-7202
E-mail: jward@mcgowanhood.com

-and-

Benjamin A. Bertram (*pro hac vice* pending)
BERTRAM & GRAF, L.L.C.
2345 Grand Boulevard, Suite 1925
Kansas City, MO 64108
Telephone: (816) 523-2205
Email: benbertram@bertramgraf.com

ATTORNEYS FOR PLAINTIFF